Good morning. May it please the court, my name is Stephanie Dovelina and I represent the appellant in this matter, Ms. Dominique Wilkerson. We're here before this court on appeal of a dismissal resulting from a motion for summary judgment granting defendant Jefferson Parish's dismissal for Wilkerson's claims of discrimination based on gender and race and retaliation. The issues presented for review are whether the court, district court erred in finding that Wilkerson failed to make a prima facie case for gender discrimination because similarly situated employees offered were not comparable. The same issue is whether the district court erred in finding that Wilkerson failed to make a prima facie case for discrimination, for race discrimination and for gender discrimination were the two. And then thirdly, whether the district court erred in finding that Wilkerson's retaliation claim failed because she did not district court erred in finding that Wilkerson failed to make a prima facie case for gender and race discrimination because she did provide evidence that similarly situated employees outside of her protected class were treated better than Wilkerson. Wilkerson submitted that male Caucasian employees, Christopher Bruno and Stanley LeBlanc, and that female Caucasian employees, Lynn Shields and Violet Trulette, were comparable employees who were similar situations. Case law establishes that Wilkerson must identify at least one co-worker outside of her protected class who was treated more favorably under nearly identical circumstances. Wilkerson submits that she met this burden that the district court erred when they determined that these employees were not similarly situated. She submits that this issue should be left to the trier of fact. Addressing the individuals that were proffered as similarly situated, first is Mr. Christopher Bruno. Mr. Christopher Bruno held the same position as Ms. Wilkerson. They were both juvenile detention home supervisors. He also had the same supervisor. They were both supervised by Assistant Director Christopher Trostclair, and the ultimate decision maker was Mr. Roy Junker. And similar but comparable violation histories, which I will go into. On December 17, 2017, Bruno was previously in the position of home manager for the juvenile detention facility. He was demoted to juvenile Bruno back in a probationary period, a status despite his seniority. Director Junker testified that when any employee is placed in a new position, they become probationary. Therefore, Bruno was probationary at that point as of December 17. Here, he was demoted to the same position. He was in the working test period for the new position when he received his expectations, the lowest rating possible. Junker acknowledged that Bruno received a rating of below expectations, and he was placed on the continued probation, and he would therefore be reevaluated in three months. On that November 19, 2018, evaluation, Bruno received a 1 in the category of STU communication and a 0 for supervision and management, while Wilkerson also received a 1 for S2 communication and a 0 for S4 supervision and management. On January 23, Bruno received another of 2019, another evaluation where he received again a 0 for S4 management. Bruno requested that he was provided additional training, which he was given. On March 12, Junker changed Bruno's ratings when he did another reevaluation. He changed Bruno's ratings, including the S4 rating to a 2, which then allowed him to meet expectations. Wilkerson, on the other hand, was terminated after her first evaluation. She also similarly requested additional training, but she was terminated the day after Junker signed her evaluation. He signed it on February 18, and she received her letter of termination on February 19, citing the same reasons that were included within the evaluation. Additionally, in the fall of 2019, there was an incident that Wilkerson referred to as a riot. It was when some of the juvenile residents had refused to return from recreation in the yard back into the facility. A detention officer, Vicks, was the detention officer on duty at the time. The supervisor with a similar position as Ms. Wilkerson was Christopher Bruno. Vicks had to call in Bruno for assistance. They were able to get the residents back into the facility, but Vicks had advised Wilkerson that he did not feel safe, that he advised Bruno of that, the supervisor on duty, and that it was not documented about the riot or Mr. Vicks' concerns about safety. During a text exchange between Wilkerson and Christopher Troskler on November 8, Wilkerson mentioned the issue between Vicks and Bruno with the residents. Troskler advised Ms. Wilkerson that he was not previously aware of this incident. It had taken place about approximately four weeks prior to the text exchange of November 8. Troskler could not articulate when a report was completed, when he was requested to ask that during deposition. He did confirm, though, that there was no documentation, no one was disciplined for the incident. One of the issues that Wilkerson was terminated for was her low rating for S-2 communication related to properly documenting incidents and an EIR investigative report. Bruno was not disciplined for failing to timely complete the report or to even advise supervisors of the incident with Vicks, despite the fact that Bruno had a prior evaluation noting that he, too, had failed to timely complete reports and properly complete these investigative reports, reporting incidents. Defendants have argued that Bruno is not a similarly situated employee because he was 25 years and, therefore, his experience disqualified him as a comparator. As previously stated, courts routinely find that an employee is similarly situated when circumstances exist that the employees being compared have the same job responsibilities. That was the case with Bruno and with Ms. Wilkerson. They shared the same supervisor and their employment status was determined by the same person. Additionally, they were also both on probation at the time period that Ms. Wilkerson was terminated immediately, but Mr. Bruno was provided additional time to return. What do we do with situations like Bruno and your client where they have some things in common but some things greatly different? I mean, he'd been there, as you mentioned, for over 20 years. He was demoted instead of terminated and received a higher score in safety. So they had some similarities but some significant differences. What do we go on? Well, Your Honor, what we would present is to look at the severity of the allegations as a whole. Although we don't have, and in looking at Ms. Wilkerson, there is a myriad of issues that have been listed within her termination report, which were in the evaluation. What we would state is that looking at the type of evaluations, although she received a zero for safety, it really goes to the same issues. If you're not reporting violations, if you're not making your supervisors aware, and as a supervisor of what is going on, then that really is a safety violation. In particular, what Junker had stated was that they focused on an incident where Mr. Trostler had appeared at the facility at 3 a.m. on the morning of January 13th. What they had stated was that because there were individuals that were found asleep, detention officers, that that was a real safety violation that could cause something to happen if they weren't aware. We would submit that it's really a similar violation here in that when you're not reporting incidents and you're not properly advising that it really can't, it too could create a very serious safety violation along with the fact that this was something that there was no incident that occurred for Ms. Wilkerson. Well, LeBlanc was also not a probationary employee and he resigned instead of being terminated. How are those comparable? What we would submit is because of the small amount of individuals that work in that position, there were a total of six, I believe, juvenile detention home supervisors, that it is nearly impossible to be able to find one comparator that will match each one. So what we attempted to do was to provide the court with, although Mr. LeBlanc was not in a probationary period and Mr. Bruno was, with additional evidence to show that Mr. LeBlanc was provided additional even though he wasn't in a probationary position, he was given additional leniency that Ms. Wilkerson wasn't. And in particular, we referenced the fact that there is a rule that allows a employee, which was referenced on Mr. LeBlanc's termination paperwork, that says that he resigned in lieu of termination. When Junker was testifying during his deposition, he testified that he had already made the decision that he was going to terminate LeBlanc. What difference does it make? Usually when it says resign in lieu of termination means I know I'm about to get fired and rather than have that on my record, I'm going to resign. The consequences were the same from the employer's standpoint. He was gone because of what had happened. We would submit that the difference being that Mr. LeBlanc was not aware that he was going to be terminated at the time he submitted his resignation, even though Mr. Junker had already... Resigned is one thing. Resignation in lieu of termination is something different to me. Right. He resigned, Mr. LeBlanc resigned, but because the department had already decided they were going to terminate him, they then instead put it in, they designated it as his termination and provided the same opportunity to be able to resign in lieu of termination. In addition, Mr. LeBlanc had some very serious violations. LeBlanc too, though. He was a permanent employee, not a probationary employee like your client, correct? That is correct. Mr. LeBlanc was a permanent employee at the time that he was terminated. Why wouldn't that be a legitimate reason to offer him another alternative that maybe wasn't offered to your client? Well, that also goes to the fact that one of the things that we presented was that the civil service rules for, the internal rules for Jefferson Parish, indicate that the employee was required, she was under probationary period for six months, and then it was going to be, it was extended. That was extended on January 21st. The rules require that the employee is advised of the fact that their probationary period is being extended. And the rule states that if it is not advised to the employee, that it is as if it was a good evaluation. So she therefore should have been in permanent status because Junker admitted and Wilkerson testified that she was never advised that her probation had been extended. And Junker testified that, yes, that is true, that it was not given to her, that they didn't advise her and they did not provide the letter. That being, therefore, even though we have probationary and non-probationary, our position is that Ms. Wilkerson should have been classified as a permanent employee at that time and been allowed to get an extra opportunity in addition to the fact that she had requested additional training. She had been requesting this for quite some time and to be provided the same accommodation that other employees, both probationary. There were more than one incident. It seems like Bruno is different for quite a few reasons. Number one, the jury does not get to decide what really happened with Bruno versus what really happened with your client and say, well, it was more severe. It has got to be from the standpoint, could a reasonable employer have thought they were roughly similar? Isn't that the law? If there is reason for the employer to think, well, this is worse than that, the jury doesn't get to second guess that, right? Yes, Your Honor. And it seems like the circumstances of the so-called riot because of various factors, the employer did not think it was that serious. Here we have Ms. Wilkerson either not doing her job, checking in at 1156 and not checking in on video until, what, 3 or 4 in the morning, plus multiple times of either her or others sleeping and evidence that she and another employee were in her office with the lights out. I mean, there is a lot more evidence than one incident, it seems to me. Yes, Your Honor, and with regard to that instance, we provide a testimony that as far as the office, Mr. Corcoran, who made that complaint, actually testified during a civil service hearing for her co-supervisor that he never saw Ms. Wilkerson or Ms. Sylvia sleep at work and that he never told Mr. Bruno that he saw them asleep, that merely he had seen the light off, but he never went up to the door to check if there was anyone inside and that there was testimony also stating that, you know, whenever they would go to do rounds, which were shared between Ms. Sylvia and Ms. Wilkerson, as they were trained to do by Mr. Bruno and Ms. Trulette, that at that point they would lock the door and turn off the light and so there was no evidence otherwise. I see that my time is up. Would you like me to continue? You could serve it for rebuttal. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. I'm Craig Watson. I'm here today representing the Parish of Jefferson. I don't think the District Court had a difficult decision and I don't think this Court does either. I want to take in turn, in reverse order, the questions that you asked because I think you get at the threshold meet of exactly what this case is about. First, I'd like to frame the issue for the Court. We have a six-month employee who's in an undisputed working test period. We all know what that means. Is it going to be a good fit for the organization? Is it going to be a good fit for her? There's less rights given to an employee during a working test period. Precisely the reason that this Court and the District Court can treat a probationary employee different than that of an employee with permanent status. And that, Your Honors, is what Judge Wehmer indicated. What do we do when we have differences? Well, the Courts say it has to be nearly identical. Not exactly identical, but nearly identical. Twenty-five years of service to the Department of Juvenile Services with a history, and he made it all the way up to the top to management, that's quite different than a six-month employee who's been there, who's trying her best to do a job that she simply can't do. What are the facts that surround why it's not nearly identical? Ms. Wilkerson was supposed to be doing written write-ups on subordinate employees. What did she do with those write-ups? Unequivocal testimony. She misplaced them. She may have thrown them out. Violation one of policy. She was supposed to ensure that individuals that are working for her were not sleeping. Vigilance. I can assure you that it is an assignment of a supervisor of a detention center to ensure that individuals stay vigilant during their shift. We all know what happened several weeks ago with Bridge City, where we had several breakouts and the crimes that occurred after that. So there is a substantive, a palliative difference between safety violations and attendance issues, which they posited should be the case with Violet Trullo, or Mr. LeBlanc, who emphatically was going to be terminated. And as Chief Judge Richmond indicated, there's no difference between resignation. We have under oath her client testified, did you have the opportunity to resign? I did. Did you do it? No. She could have walked in there and resigned, and she would have received the same thing. That's not the substantial evidence that's needed to controvert pretext in the case, because somebody had the opportunity who's got tenure with the service, as Judge Willett pointed out, who indicated there is a difference between that employee and this So the judge, the district court, was correct. You can't meet the prima facie burden for sex and race discrimination because you can't establish a valid comparator. That, too, falls right in line when you try to get to pretext. There's no comparator. Chris Bruno, 25-year employee, a different violation history, that's not nearly identical. You then step forward to the other comparators, which is the only way that this case could survive on summary judgment, and you get to Lynn Shields, the other probationary employee. She had attendance issues. Guess what she scored in safety? She scored a 2, meets expectations. What did Wilkerson score? A 0, all attributable to the incident that occurred in January of 2020. And it's also important to note that there was a credibility call that Mr. Junker had to make in connection with the predisciplinary hearing as to what Ms. Wilkerson was stating. She was arguing that, you know, I don't fall asleep. She was accused of herself falling asleep on the job. And I'm going to quote it because I'd never heard the word before when she tried to explain the difference between dozing and sleeping. She called it micro-sleeping. And I'll submit to this Court that whether you're micro-sleeping, whether you're dozing or whether you're sleeping, one thing is abundantly clear. You're not vigilant. You're not ensuring the safety of the residents. You're not ensuring the safety of your staff. That type of explanation is exactly what went to the heart of the mind of Mr. Junker when he's making the decision during a working test for an employee. Is this the type of supervisor that we want administering the Department of Juvenile Services? Is this the role model that we want to set for our subordinate detention officers who we look up to? So if you have a supervisor who doesn't take supervision seriously, doesn't record the writings, then what are they going to do? They're going to continue to sleep on the job just like they did. I have a question. When I read the briefs about Ms. Shields, it said she arrived late multiple times. Were there gaps of people to do that job when she didn't show up? Because that would be a safety issue. It would, Your Honor. And I did look at that myself. When she showed up late, the other people had to stay later. So there was still a continuity of services being provided to the Department of Justice. It's also critical when you're looking at Lynn Shields why we Wilkerson received a one. So that can't be nearly identical when you've got broad differences in performance and in the severity of the incidences. Does the record show whether Shields was permanent or temporary? Shields was a temporary employee at the time that she received the performance evaluation, which denoted that she met expectations with safety and she met expectations with decision making, but she didn't meet expectations with respect to attendance. And I can just submit to you that showing up late while it can't be condoned is vastly different than allowing your individuals to sleep on the job and then craft an excuse such as microsleeping or dozing when you yourself are accused of doing it. There's credibility issues there with respect to whether Ms. Wilkerson was honest and forthright in her predisciplinary hearing, and at the end of the day, the failure of Ms. Wilkerson to produce a nearly identical comparator is fatal as the district court found in its case. I do want to move over just in the event that my colleague addresses an issue on the retaliation component in her rebuttal. One thing that's going to likely be pointed out is that the district court did find that Ms. Wilkerson met a prima facie burden of retaliation, and I want to submit to you, and it's denoted in the record, it's because of a single email. And I think it's important because the courts have established that temporal proximity is a factor that you can look at when you make the decision as to whether a prima facie case. But it's also equally important on our end and in years to our benefit when establishing whether or not pretexts could controvert the, whether they established pretexts to contribute the granting of the summary judgment and the foundation of a legitimate nondiscriminatory justification. That one email, which indicates that the supervisor was treating her and another employee differently, came about after the January incident involving sleeping, after she received the pre-notice of her predisciplinary hearing and investigation, after she went through the notice of investigation. In fact, Mr. Junker testified that he always elicits them to provide a writing any time he's in a pre-disciplinary hearing because sometimes things don't come out in the pre-disciplinary hearing. One thing that is a fact in the record, she didn't mention discrimination. She didn't mention any sex or gender in her, or gender discrimination in her pre-disciplinary hearing. It wasn't until after Mr. Junker said if you'd like to add anything else, you may do so in writing. And at that point in time, she was already under investigation. So one can't plausibly come here today and say you received below expectations for safety performances, you've had a pre-disciplinary hearing where your credibility is at question, and now somehow he's foreclosed from taking adverse action simply because she says in a single email, I think I've been treated disparately. The courts are clear you need substantial evidence to refute the legitimate nondiscriminatory justification when attempting to try to establish pretext, and she has not done it. The only way she could get to pretext is, again, showing that somebody was treated differently than her, and she cannot do that because each of the individuals are all different with respect to violation history and with respect to tenure within the department. A failure to meet the nearly identical component of this was fatal to her case, as the district court concluded. And with respect to unless this court has any additional questions, I think that the brief stand for themselves and the brevity in this case and succinctness speaks bounds as to the affirmation that we respectfully request that this court grant with respect to the trial court judgment dismissing Ms. Wilkerson's claims with full prejudice. Thank you. Thank you, Your Honors. I'd like to address the issues that the other party has just talked about. In particular, the issue that I would like to address is in discussing the circumstances, which was stating that the issue of January 13th and that Ms. Wilkerson was accused of sleeping on the job as well as other individuals being asleep on the job. Ms. Wilkerson called microsleeping, but she did testify that it is when you're starting to fall asleep, she would work the night shift. They would work from midnight to 8 a.m. And so that at that time of night, it does make you want to fall asleep. One of the issues that Ms. Wilkerson had previously complained about to Mr. Troskler was regarding the shifts and the detention officers. Ms. Violet Trulette, who was also a supervisor, was in charge of putting the was disciplined for two detention officers, Ms. Bailey and Ms. Taylor, being asleep on the job on the 17th. However, Ms. Wilkerson, we found that it isn't quite fair to assert, to require Ms. Wilkerson to maintain that they were awake given the circumstances of the incident. What happened was when Mr. Troskler came up, Bailey had testified, or she provided information to Mr. Troskler that she fell asleep at work because she was sick and she took flu medication that made her drowsy. Ms. Wilkerson was not aware of the fact that Ms. Bailey was feeling ill because she didn't call in and advise of that and that she had taken medication, which is prohibited so that they stay alert. Taylor also stated, who also was found falling asleep, that she was required to stay into the next shift. So Taylor was through 7 a.m. on January 13th. She thought she was going to be relieved from her position and so she took the required blood pressure medication, which can cause drowsiness. Then she was required to stay on longer. Part of the issues were, and that correlates to with Ms. Violet Trulette, and Ms. Lynn Shields. Ms. Lynn Shields was a supervisor for the morning shift and so what would, and Ms. Trulette, when Ms. Trulette did not update the detention officer's schedule so that they could, so that there was adequate coverage in the morning, the detention officers that were working the night shift were routinely required to stay late, in addition to the supervisors such as Ms. Wilkerson when there were issues like Ms. Lynn Shields that was allowed to come in later. So we submit that these factual differences really have a bearing on pretext and as to the discipline that was rendered against Ms. Wilkerson being the fact that the circumstances were outside of her control. She was not in charge of the schedules and these individuals were required to stay on forward. She had, at the time that Mr. Trostclair appeared on January 13th, she was in the process of drafting up a coaching counseling for Ms. Bailey who had previously been caught asleep. What she had done is she provided her with a verbal warning, then it had been about a month until she had seen a similar incident on that, and so that's when she was drafting up a coaching counseling, discussing it with Ms. Silby who also testified that she was not asleep. Mr. Trostclair did not provide any evidence except his own testimony that he believed she was asleep besides the fact that both Ms. Wilkerson and Ms. Silby routinely and repeatedly stated that neither one of them was asleep, that they were both talking the entire time. Junker also stated that Silby had said in her pre-termination or pre-disciplinary hearing that Ms. Wilkerson was asleep on the job. However, that isn't really what the testimony states. He kept pressuring her and asking her, do other people sleep? Who sleeps? Does your co-worker sleep? And she says, well, I don't know. So he said, well, give me an estimate how many times a week. And she said, I don't know. Everybody starts to doze off. But she did not state that Ms. Wilkerson was asleep, and that is a factual contention. That is a fact that is in contention that both have stated did not occur. We'd also like to submit with regard to the retaliation that we've also provided information that after she met her prima facie case that it's pretextual related to the factual statements in particular concerning the January 13th incident. Do we have no further questions, Your Honors? Thank you. Thank you. That will conclude the arguments before the court.